IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. |
| | * | |
| v. | * | (18 U.S.C. §§ 2, 371, 1030, 1028A, 1956, and 3551 et seq.) |
| | * | |
| VIKTOR BORISOVICH NETYKSHO, | * | |
| BORIS ALEKSEYEVICH ANTONOV, | * | |
| DMITRIY SERGEYEVICH BADIN, | * | |
| IVAN SERGEYEVICH YERMAKOV, | * | |
| ALEKSEY VIKTOROVICH LUKASHEV, | * | |
| SERGEY ALEKSANDROVICH MORGACHEV, | * | |
| NIKOLAY YURYEVICH KOZACHEK, | * | |
| PAVEL VYACHESLAVOVICH YERSHOV, | * | |
| ARTEM ANDREYEVICH MALYSHEV, | * | |
| ALEKSANDR VLADIMIROVICH OSADCHUK, | * | |
| ALEKSEY ALEKSANDROVICH POTEMKIN, and | * | |
| ANATOLIY SERGEYEVICH KOVALEV, | * | |
| | * | |
| Defendants. | * | |
| | * | |

*******

## INDICTMENT

The Grand Jury for the District of Columbia charges:

## COUNT ONE
### (Conspiracy to Commit an Offense Against the United States)

1.      In or around 2016, the Russian Federation ("Russia") operated a military intelligence agency called the Main Intelligence Directorate of the General Staff ("GRU"). The GRU had multiple units, including Units 26165 and 74455, engaged in cyber operations that involved the staged releases of documents stolen through computer intrusions. These units conducted large-scale cyber operations to interfere with the 2016 U.S. presidential election.

2.      Defendants VIKTOR BORISOVICH NETYKSHO, BORIS ALEKSEYEVICH ANTONOV, DMITRIY SERGEYEVICH BADIN, IVAN SERGEYEVICH YERMAKOV, ALEKSEY VIKTOROVICH LUKASHEV, SERGEY ALEKSANDROVICH MORGACHEV, NIKOLAY YURYEVICH KOZACHEK, PAVEL VYACHESLAVOVICH YERSHOV, ARTEM ANDREYEVICH MALYSHEV, ALEKSANDR VLADIMIROVICH OSADCHUK, and ALEKSEY ALEKSANDROVICH POTEMKIN were GRU officers who knowingly and intentionally conspired with each other, and with persons known and unknown to the Grand Jury (collectively the "Conspirators"), to gain unauthorized access (to "hack") into the computers of U.S. persons and entities involved in the 2016 U.S. presidential election, steal documents from those computers, and stage releases of the stolen documents to interfere with the 2016 U.S. presidential election.

3.      Starting in at least March 2016, the Conspirators used a variety of means to hack the email accounts of volunteers and employees of the U.S. presidential campaign of Hillary Clinton (the "Clinton Campaign"), including the email account of the Clinton Campaign's chairman.

4.      By in or around April 2016, the Conspirators also hacked into the computer networks of the Democratic Congressional Campaign Committee ("DCCC") and the Democratic National Committee ("DNC").  The Conspirators covertly monitored the computers of dozens of DCCC and DNC employees, implanted hundreds of files containing malicious computer code ("malware"), and stole emails and other documents from the DCCC and DNC.

5.      By in or around April 2016, the Conspirators began to plan the release of materials stolen from the Clinton Campaign, DCCC, and DNC.

6.      Beginning in or around June 2016, the Conspirators staged and released tens of thousands of the stolen emails and documents.  They did so using fictitious online personas, including

"DCLeaks" and "Guccifer 2.0."

7.      The Conspirators also used the Guccifer 2.0 persona to release additional stolen documents through a website maintained by an organization ("Organization 1"), that had previously posted documents stolen from U.S. persons, entities, and the U.S. government.   The Conspirators continued their U.S. election-interference operations through in or around November 2016.

8.      To hide their connections to Russia and the Russian government, the Conspirators used false identities and made false statements about their identities. To further avoid detection, the Conspirators used a network of computers located across the world, including in the United States, and paid for this infrastructure using cryptocurrency.

**Defendants**

9.      Defendant VIKTOR BORISOVICH NETYKSHO (Нетыкшо Виктор Борисович) was the Russian military officer in command of Unit 26165, located at 20 Komsomolskiy Prospekt, Moscow, Russia.  Unit 26165 had primary responsibility for hacking the DCCC and DNC, as well as the email accounts of individuals affiliated with the Clinton Campaign.

10.      Defendant BORIS ALEKSEYEVICH ANTONOV (Антонов Борис Алексеевич) was a Major in the Russian military assigned to Unit 26165.  ANTONOV oversaw a department within Unit 26165 dedicated to targeting military, political, governmental, and non-governmental organizations with spearphishing emails and other computer intrusion activity.  ANTONOV held the title "Head of Department."  In or around 2016, ANTONOV supervised other co-conspirators who targeted the DCCC, DNC, and individuals affiliated with the Clinton Campaign.

11.      Defendant DMITRIY SERGEYEVICH BADIN (Бадин Дмитрий Сергеевич) was a Russian military officer assigned to Unit 26165 who held the title "Assistant Head of Department." In or around 2016, BADIN, along with ANTONOV,  supervised other co-conspirators who targeted the DCCC, DNC, and individuals affiliated with the Clinton Campaign.

12.     Defendant IVAN SERGEYEVICH YERMAKOV (Ермаков Иван Сергеевич) was a Russian military officer assigned to ANTONOV's department within Unit 26165.  Since in or around 2010, YERMAKOV used various online personas, including "Kate S. Milton," "James McMorgans," and "Karen W. Millen," to conduct hacking operations on behalf of Unit 26165.  In or around March 2016, YERMAKOV participated in hacking at least two email accounts from which campaign-related documents were released through DCLeaks.  In or around May 2016, YERMAKOV also participated in hacking the DNC email server and stealing DNC emails that were later released through Organization 1.

13.     Defendant ALEKSEY VIKTOROVICH LUKASHEV (Лукашев Алексей Викторович) was a Senior Lieutenant in the Russian military assigned to ANTONOV's department within Unit 26165.  LUKASHEV used various online personas, including "Den Katenberg" and "Yuliana Martynova."   In or around 2016, LUKASHEV sent spearphishing emails to members of the Clinton Campaign and affiliated individuals, including the chairman of the Clinton Campaign.

14.     Defendant SERGEY ALEKSANDROVICH MORGACHEV (Моргачев Сергей Александрович) was a Lieutenant Colonel in the Russian military assigned to Unit 26165.  MORGACHEV oversaw a department within Unit 26165 dedicated to developing and managing malware, including a hacking tool used by the GRU known as "X-Agent."  During the hacking of the DCCC and DNC networks, MORGACHEV supervised the co-conspirators who developed and monitored the X-Agent malware implanted on those computers.

15.     Defendant NIKOLAY YURYEVICH KOZACHEK (Козачек Николай Юрьевич) was a Lieutenant Captain in the Russian military assigned to MORGACHEV's department within Unit 26165.  KOZACHEK used a variety of monikers, including "kazak" and "blablabla1234565."  KOZACHEK developed, customized, and monitored X-Agent malware used to hack the DCCC

and DNC networks beginning in or around April 2016.

16.     Defendant PAVEL VYACHESLAVOVICH YERSHOV (Ершов Павел Вячеславович) was a Russian military officer assigned to MORGACHEV's department within Unit 26165.  In or around 2016, YERSHOV assisted KOZACHEK and other co-conspirators in testing and customizing X-Agent malware before actual deployment and use.

17.     Defendant ARTEM ANDREYEVICH MALYSHEV (Малышев Артём Андреевич) was a Second Lieutenant in the Russian military assigned to MORGACHEV's department within Unit 26165.  MALYSHEV used a variety of monikers, including "djangomagicdev" and "realblatr."  In or around 2016, MALYSHEV monitored X-Agent malware implanted on the DCCC and DNC networks.

18.     Defendant ALEKSANDR VLADIMIROVICH OSADCHUK (Осадчук Александр Владимирович) was a Colonel in the Russian military and the commanding officer of Unit 74455. Unit 74455 was located at 22 Kirova Street, Khimki, Moscow, a building referred to within the GRU as the "Tower."  Unit 74455 assisted in the release of stolen documents through the DCLeaks and Guccifer 2.0 personas, the promotion of those releases, and the publication of anti-Clinton content on social media accounts operated by the GRU.

19.     Defendant ALEKSEY ALEKSANDROVICH POTEMKIN (Потемкин Алексей Александрович) was an officer in the Russian military assigned to Unit 74455.  POTEMKIN was a supervisor in a department within Unit 74455 responsible for the administration of computer infrastructure used in cyber operations.  Infrastructure and social media accounts administered by POTEMKIN's department were used, among other things, to assist in the release of stolen documents through the DCLeaks and Guccifer 2.0 personas.

## Object of the Conspiracy

20.     The object of the conspiracy was to hack into the computers of U.S. persons and entities involved in the 2016 U.S. presidential election, steal documents from those computers, and stage releases of the stolen documents to interfere with the 2016 U.S. presidential election.

## Manner and Means of the Conspiracy

### Spearphishing Operations

21.     ANTONOV, BADIN, YERMAKOV, LUKASHEV, and their co-conspirators targeted victims using a technique known as spearphishing to steal victims' passwords or otherwise gain access to their computers.  Beginning by at least March 2016, the Conspirators targeted over 300 individuals affiliated with the Clinton Campaign, DCCC, and DNC.

      a.     For example, on or about March 19, 2016, LUKASHEV and his co-conspirators created and sent a spearphishing email to the chairman of the Clinton Campaign. LUKASHEV used the account "john356gh" at an online service that abbreviated lengthy website addresses (referred to as a "URL-shortening service"). LUKASHEV used the account to mask a link contained in the spearphishing email, which directed the recipient to a GRU-created website.  LUKASHEV altered the appearance of the sender email address in order to make it look like the email was a security notification from Google (a technique known as "spoofing"), instructing the user to change his password by clicking the embedded link.  Those instructions were followed.  On or about March 21, 2016, LUKASHEV, YERMAKOV, and their co-conspirators stole the contents of the chairman's email account, which consisted of over 50,000 emails.

      b.     Starting on or about March 19, 2016, LUKASHEV and his co-conspirators sent spearphishing emails to the personal accounts of other individuals affiliated with

the Clinton Campaign, including its campaign manager and a senior foreign policy advisor.  On or about March 25, 2016, LUKASHEV used the same john356gh account to mask additional links included in spearphishing emails sent to numerous individuals affiliated with the Clinton Campaign, including Victims 1 and 2. LUKASHEV sent these emails from the Russia-based email account hi.mymail@yandex.com that he spoofed to appear to be from Google.

c.      On or about March 28, 2016, YERMAKOV researched the names of Victims 1 and 2 and their association with Clinton on various social media sites.  Through their spearphishing operations, LUKASHEV, YERMAKOV, and their co-conspirators successfully stole email credentials and thousands of emails from numerous individuals affiliated with the Clinton Campaign.  Many of these stolen emails, including those from Victims 1 and 2, were later released by the Conspirators through DCLeaks.

d.      On or about April 6, 2016, the Conspirators created an email account in the name (with a one-letter deviation from the actual spelling) of a known member of the Clinton Campaign.  The Conspirators then used that account to send spearphishing emails to the work accounts of more than thirty different Clinton Campaign employees.  In the spearphishing emails, LUKASHEV and his co-conspirators embedded a link purporting to direct the recipient to a document titled "hillary-clinton-favorable-rating.xlsx."  In fact, this link directed the recipients' computers to a GRU-created website.

22.     The Conspirators spearphished individuals affiliated with the Clinton Campaign throughout the summer of 2016.  For example, on or about July 27, 2016, the Conspirators

attempted after hours to spearphish for the first time email accounts at a domain hosted by a third-party provider and used by Clinton's personal office.  At or around the same time, they also targeted seventy-six email addresses at the domain for the Clinton Campaign.

Hacking into the DCCC Network

23.     Beginning in or around March 2016, the Conspirators, in addition to their spearphishing efforts, researched the DCCC and DNC computer networks to identify technical specifications and vulnerabilities.

    a.     For example, beginning on or about March 15, 2016, YERMAKOV ran a technical query for the DNC's internet protocol configurations to identify connected devices.

    b.     On or about the same day, YERMAKOV searched for open-source information about the DNC network, the Democratic Party, and Hillary Clinton.

    c.     On or about April 7, 2016, YERMAKOV ran a technical query for the DCCC's internet protocol configurations to identify connected devices.

24.     By in or around April 2016, within days of YERMAKOV's searches regarding the DCCC, the Conspirators hacked into the DCCC computer network.  Once they gained access, they installed and managed different types of malware to explore the DCCC network and steal data.

    a.     On or about April 12, 2016, the Conspirators used the stolen credentials of a DCCC Employee ("DCCC Employee 1") to access the DCCC network.  DCCC Employee 1 had received a spearphishing email from the Conspirators on or about April 6, 2016, and entered her password after clicking on the link.

    b.     Between in or around April 2016 and June 2016, the Conspirators installed multiple versions of their X-Agent malware on at least ten DCCC computers, which allowed them to monitor individual employees' computer activity, steal passwords, and maintain access to the DCCC network.

8

c.    X-Agent malware implanted on the DCCC network transmitted information from the victims' computers to a GRU-leased server located in Arizona.   The Conspirators referred to this server as their "AMS" panel.   KOZACHEK, MALYSHEV, and their co-conspirators logged into the AMS panel to use X-Agent's keylog and screenshot functions in the course of monitoring and surveilling activity on the DCCC computers.   The keylog function allowed the Conspirators to capture keystrokes entered by DCCC employees.   The screenshot function allowed the Conspirators to take pictures of the DCCC employees' computer screens.

d.    For example, on or about April 14, 2016, the Conspirators repeatedly activated X-Agent's keylog and screenshot functions to surveil DCCC Employee 1's computer activity over the course of eight hours.   During that time, the Conspirators captured DCCC Employee 1's communications with co-workers and the passwords she entered while working on fundraising and voter outreach projects.   Similarly, on or about April 22, 2016, the Conspirators activated X-Agent's keylog and screenshot functions to capture the discussions of another DCCC Employee ("DCCC Employee 2") about the DCCC's finances, as well as her individual banking information and other personal topics.

25.    On or about April 19, 2016, KOZACHEK, YERSHOV, and their co-conspirators remotely configured an overseas computer to relay communications between X-Agent malware and the AMS panel and then tested X-Agent's ability to connect to this computer.   The Conspirators referred to this computer as a "middle server."   The middle server acted as a proxy to obscure the connection between malware at the DCCC and the Conspirators' AMS panel.   On or about April

20, 2016, the Conspirators directed X-Agent malware on the DCCC computers to connect to this middle server and receive directions from the Conspirators.

<u>Hacking into the DNC Network</u>

26.   On or about April 18, 2016, the Conspirators hacked into the DNC's computers through their access to the DCCC network.  The Conspirators then installed and managed different types of malware (as they did in the DCCC network) to explore the DNC network and steal documents.

   a.   On or about April 18, 2016, the Conspirators activated X-Agent's keylog and screenshot functions to steal credentials of a DCCC employee who was authorized to access the DNC network.  The Conspirators hacked into the DNC network from the DCCC network using stolen credentials.   By in or around June 2016, they gained access to approximately thirty-three DNC computers.

   b.   In or around April 2016, the Conspirators installed X-Agent malware on the DNC network, including the same versions installed on the DCCC network. MALYSHEV and his co-conspirators monitored the X-Agent malware from the AMS panel and captured data from the victim computers.  The AMS panel collected thousands of keylog and screenshot results from the DCCC and DNC computers, such as a screenshot and keystroke capture of DCCC Employee 2 viewing the DCCC's online banking information.

<u>Theft of DCCC and DNC Documents</u>

27.   The Conspirators searched for and identified computers within the DCCC and DNC networks that stored information related to the 2016 U.S. presidential election.  For example, on or about April 15, 2016, the Conspirators searched one hacked DCCC computer for terms that included "hillary," "cruz," and "trump."   The Conspirators also copied select DCCC folders, including "Benghazi Investigations."  The Conspirators targeted computers containing information

such as opposition research and field operation plans for the 2016 elections.

28.     To enable them to steal a large number of documents at once without detection, the Conspirators used a publicly available tool to gather and compress multiple documents on the DCCC and DNC networks.   The Conspirators then used other GRU malware, known as "X-Tunnel," to move the stolen documents outside the DCCC and DNC networks through encrypted channels.

  a.  For example, on or about April 22, 2016, the Conspirators compressed gigabytes of data from DNC computers, including opposition research.   The Conspirators later moved the compressed DNC data using X-Tunnel to a GRU-leased computer located in Illinois.

  b.  On or about April 28, 2016, the Conspirators connected to and tested the same computer located in Illinois.   Later that day, the Conspirators used X-Tunnel to connect to that computer to steal additional documents from the DCCC network.

29.     Between on or about May 25, 2016 and June 1, 2016, the Conspirators hacked the DNC Microsoft Exchange Server and stole thousands of emails from the work accounts of DNC employees.   During that time, YERMAKOV researched PowerShell commands related to accessing and managing the Microsoft Exchange Server.

30.     On or about May 30, 2016, MALYSHEV accessed the AMS panel in order to upgrade custom AMS software on the server.   That day, the AMS panel received updates from approximately thirteen different X-Agent malware implants on DCCC and DNC computers.

31.     During the hacking of the DCCC and DNC networks, the Conspirators covered their tracks by intentionally deleting logs and computer files.   For example, on or about May 13, 2016, the Conspirators cleared the event logs from a DNC computer.   On or about June 20, 2016, the

Conspirators deleted logs from the AMS panel that documented their activities on the panel, including the login history.

## Efforts to Remain on the DCCC and DNC Networks

32.    Despite the Conspirators' efforts to hide their activity, beginning in or around May 2016, both the DCCC and DNC became aware that they had been hacked and hired a security company ("Company 1") to identify the extent of the intrusions.  By in or around June 2016, Company 1 took steps to exclude intruders from the networks.  Despite these efforts, a Linux-based version of X-Agent, programmed to communicate with the GRU-registered domain linuxkrnl.net, remained on the DNC network until in or around October 2016.

33.    In response to Company 1's efforts, the Conspirators took countermeasures to maintain access to the DCCC and DNC networks.

     a.    On or about May 31, 2016, YERMAKOV searched for open-source information about Company 1 and its reporting on X-Agent and X-Tunnel.  On or about June 1, 2016, the Conspirators attempted to delete traces of their presence on the DCCC network using the computer program CCleaner.

     b.    On or about June 14, 2016, the Conspirators registered the domain actblues.com, which mimicked the domain of a political fundraising platform that included a DCCC donations page.  Shortly thereafter, the Conspirators used stolen DCCC credentials to modify the DCCC website and redirect visitors to the actblues.com domain.

     c.    On or about June 20, 2016, after Company 1 had disabled X-Agent on the DCCC network, the Conspirators spent over seven hours unsuccessfully trying to connect to X-Agent.  The Conspirators also tried to access the DCCC network using previously stolen credentials.

34.    In or around September 2016, the Conspirators also successfully gained access to DNC computers hosted on a third-party cloud-computing service.   These computers contained test applications related to the DNC's analytics.   After conducting reconnaissance, the Conspirators gathered data by creating backups, or "snapshots," of the DNC's cloud-based systems using the cloud provider's own technology.   The Conspirators then moved the snapshots to cloud-based accounts they had registered with the same service, thereby stealing the data from the DNC.

### Stolen Documents Released through DCLeaks

35.    More than a month before the release of any documents, the Conspirators constructed the online persona DCLeaks to release and publicize stolen election-related documents.   On or about April 19, 2016, after attempting to register the domain electionleaks.com, the Conspirators registered the domain dcleaks.com through a service that anonymized the registrant.   The funds used to pay for the dcleaks.com domain originated from an account at an online cryptocurrency service that the Conspirators also used to fund the lease of a virtual private server registered with the operational email account dirbinsaabol@mail.com.   The dirbinsaabol email account was also used to register the john356gh URL-shortening account used by LUKASHEV to spearphish the Clinton Campaign chairman and other campaign-related individuals.

36.    On or about June 8, 2016, the Conspirators launched the public website dcleaks.com, which they used to release stolen emails.   Before it shut down in or around March 2017, the site received over one million page views.   The Conspirators falsely claimed on the site that DCLeaks was started by a group of "American hacktivists," when in fact it was started by the Conspirators.

37.    Starting in or around June 2016 and continuing through the 2016 U.S. presidential election, the Conspirators used DCLeaks to release emails stolen from individuals affiliated with the Clinton Campaign.   The Conspirators also released documents they had stolen in other spearphishing operations, including those they had conducted in 2015 that collected emails from individuals

affiliated with the Republican Party.

38.     On or about June 8, 2016, and at approximately the same time that the dcleaks.com website was launched, the Conspirators created a DCLeaks Facebook page using a preexisting social media account under the fictitious name "Alice Donovan."   In addition to the DCLeaks Facebook page, the Conspirators used other social media accounts in the names of fictitious U.S. persons such as "Jason Scott" and "Richard Gingrey" to promote the DCLeaks website.  The Conspirators accessed these accounts from computers managed by POTEMKIN and his co-conspirators.

39.     On or about June 8, 2016, the Conspirators created the Twitter account @dcleaks_.  The Conspirators operated the @dcleaks_ Twitter account from the same computer used for other efforts to interfere with the 2016 U.S. presidential election. For example, the Conspirators used the same computer to operate the Twitter account @BaltimoreIsWhr, through which they encouraged U.S. audiences to "[j]oin our flash mob" opposing Clinton and to post images with the hashtag #BlacksAgainstHillary.

<u>Stolen Documents Released through Guccifer 2.0</u>

40.     On or about June 14, 2016, the DNC—through Company 1—publicly announced that it had been hacked by Russian government actors.  In response, the Conspirators created the online persona Guccifer 2.0 and falsely claimed to be a lone Romanian hacker to undermine the allegations of Russian responsibility for the intrusion.

41.     On or about June 15, 2016, the Conspirators logged into a Moscow-based server used and managed by Unit 74455 and, between 4:19 PM and 4:56 PM Moscow Standard Time, searched for certain words and phrases, including:

| Search Term(s) |
| --- |
| "some hundred sheets" |
| "some hundreds of sheets" |
| dcleaks |
| illuminati |
| широко известный перевод<br>[widely known translation] |
| "worldwide known" |
| "think twice about" |
| "company's competence" |

42.     Later that day, at 7:02 PM Moscow Standard Time, the online persona Guccifer 2.0 published its first post on a blog site created through WordPress.  Titled "DNC's servers hacked by a lone hacker," the post used numerous English words and phrases that the Conspirators had searched for earlier that day (bolded below):

> **Worldwide known** cyber security company [Company 1] announced that the Democratic National Committee (DNC) servers had been hacked by "sophisticated" hacker groups.
>
> I'm very pleased the company appreciated my skills so highly))) [. . .]
>
> Here are just a few docs from many thousands I extracted when hacking into DNC's network. [. . .]
>
> **Some hundred sheets**! This's a serious case, isn't it?  [. . .]
>
> I guess [Company 1] customers should **think twice about company's competence**.
>
> F[***]   the   **Illuminati**   and   their   conspiracies!!!!!!!!!   F[***] [Company 1]!!!!!!!!!

43.     Between in or around June 2016 and October 2016, the Conspirators used Guccifer 2.0 to release documents through WordPress that they had stolen from the DCCC and DNC.  The Conspirators, posing as Guccifer 2.0, also shared stolen documents with certain individuals.

        a.      On or about August 15, 2016, the Conspirators, posing as Guccifer 2.0, received a

request for stolen documents from a candidate for the U.S. Congress. The Conspirators responded using the Guccifer 2.0 persona and sent the candidate stolen documents related to the candidate's opponent.

b.   On or about August 22, 2016, the Conspirators, posing as Guccifer 2.0, transferred approximately 2.5 gigabytes of data stolen from the DCCC to a then-registered state lobbyist and online source of political news. The stolen data included donor records and personal identifying information for more than 2,000 Democratic donors.

c.   On or about August 22, 2016, the Conspirators, posing as Guccifer 2.0, sent a reporter stolen documents pertaining to the Black Lives Matter movement. The reporter responded by discussing when to release the documents and offering to write an article about their release.

44.   The Conspirators, posing as Guccifer 2.0, also communicated with U.S. persons about the release of stolen documents. On or about August 15, 2016, the Conspirators, posing as Guccifer 2.0, wrote to a person who was in regular contact with senior members of the presidential campaign of Donald J. Trump, "thank u for writing back . . . do u find anyt[h]ing interesting in the docs i posted?" On or about August 17, 2016, the Conspirators added, "please tell me if i can help u anyhow . . . it would be a great pleasure to me." On or about September 9, 2016, the Conspirators, again posing as Guccifer 2.0, referred to a stolen DCCC document posted online and asked the person, "what do u think of the info on the turnout model for the democrats entire presidential campaign." The person responded, "[p]retty standard."

45.   The Conspirators conducted operations as Guccifer 2.0 and DCLeaks using overlapping computer infrastructure and financing.

a.   For example, between on or about March 14, 2016 and April 28, 2016, the

Conspirators used the same pool of bitcoin funds to purchase a virtual private network ("VPN") account and to lease a server in Malaysia. In or around June 2016, the Conspirators used the Malaysian server to host the dcleaks.com website. On or about July 6, 2016, the Conspirators used the VPN to log into the @Guccifer_2 Twitter account. The Conspirators opened that VPN account from the same server that was also used to register malicious domains for the hacking of the DCCC and DNC networks.

b.      On or about June 27, 2016, the Conspirators, posing as Guccifer 2.0, contacted a U.S. reporter with an offer to provide stolen emails from "Hillary Clinton's staff." The Conspirators then sent the reporter the password to access a nonpublic, password-protected portion of dcleaks.com containing emails stolen from Victim 1 by LUKASHEV, YERMAKOV, and their co-conspirators in or around March 2016.

46.      On or about January 12, 2017, the Conspirators published a statement on the Guccifer 2.0 WordPress blog, falsely claiming that the intrusions and release of stolen documents had "totally no relation to the Russian government."

Use of Organization 1

47.      In order to expand their interference in the 2016 U.S. presidential election, the Conspirators transferred many of the documents they stole from the DNC and the chairman of the Clinton Campaign to Organization 1. The Conspirators, posing as Guccifer 2.0, discussed the release of the stolen documents and the timing of those releases with Organization 1 to heighten their impact on the 2016 U.S. presidential election.

a.      On or about June 22, 2016, Organization 1 sent a private message to Guccifer 2.0 to "[s]end any new material [stolen from the DNC] here for us to review and it will

have a much higher impact than what you are doing."  On or about July 6, 2016, Organization 1 added, "if you have anything hillary related we want it in the next tweo [*sic*] days prefable [*sic*] because the DNC [Democratic National Convention] is approaching and she will solidify bernie supporters behind her after."  The Conspirators responded, "ok . . . i see."  Organization 1 explained, "we think trump has only a 25% chance of winning against hillary . . . so conflict between bernie and hillary is interesting."

   b.   After failed attempts to transfer the stolen documents starting in late June 2016, on or about July 14, 2016, the Conspirators, posing as Guccifer 2.0, sent Organization 1 an email with an attachment titled "wk dnc link1.txt.gpg."  The Conspirators explained to Organization 1 that the encrypted file contained instructions on how to access an online archive of stolen DNC documents.  On or about July 18, 2016, Organization 1 confirmed it had "the 1Gb or so archive" and would make a release of the stolen documents "this week."

48.   On or about July 22, 2016, Organization 1 released over 20,000 emails and other documents stolen from the DNC network by the Conspirators.  This release occurred approximately three days before the start of the Democratic National Convention.  Organization 1 did not disclose Guccifer 2.0's role in providing them.  The latest-in-time email released through Organization 1 was dated on or about May 25, 2016, approximately the same day the Conspirators hacked the DNC Microsoft Exchange Server.

49.   On or about October 7, 2016, Organization 1 released the first set of emails from the chairman of the Clinton Campaign that had been stolen by LUKASHEV and his co-conspirators. Between on or about October 7, 2016 and November 7, 2016, Organization 1 released

approximately thirty-three tranches of documents that had been stolen from the chairman of the Clinton Campaign.  In total, over 50,000 stolen documents were released.

## **Statutory Allegations**

50.     Paragraphs 1 through 49 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

51.     From at least in or around March 2016 through November 2016, in the District of Columbia and elsewhere, Defendants NETYKSHO, ANTONOV, BADIN, YERMAKOV, LUKASHEV, MORGACHEV, KOZACHEK, YERSHOV, MALYSHEV, OSADCHUK, and POTEMKIN, together with others known and unknown to the Grand Jury, knowingly and intentionally conspired to commit offenses against the United States, namely:

     a.     To knowingly access a computer without authorization and exceed authorized access to a computer, and to obtain thereby information from a protected computer, where the value of the information obtained exceeded $5,000, in violation of Title 18, United States Code, Sections 1030(a)(2)(C) and 1030(c)(2)(B); and

     b.     To knowingly cause the transmission of a program, information, code, and command, and as a result of such conduct, to intentionally cause damage without authorization to a protected computer, and where the offense did cause and, if completed, would have caused, loss aggregating $5,000 in value to at least one person during a one-year period from a related course of conduct affecting a protected computer, and damage affecting at least ten protected computers during a one-year period, in violation of Title 18, United States Code, Sections 1030(a)(5)(A) and 1030(c)(4)(B).

52.     In furtherance of the Conspiracy and to effect its illegal objects, the Conspirators committed the overt acts set forth in paragraphs 1 through 19, 21 through 49, 55, and 57 through

64, which are re-alleged and incorporated by reference as if fully set forth herein.

53.     In furtherance of the Conspiracy, and as set forth in paragraphs 1 through 19, 21 through 49, 55, and 57 through 64, the Conspirators knowingly falsely registered a domain name and knowingly used that domain name in the course of committing an offense, namely, the Conspirators registered domains, including dcleaks.com and actblues.com, with false names and addresses, and used those domains in the course of committing the felony offense charged in Count One.

All in violation of Title 18, United States Code, Sections 371 and 3559(g)(1).

## COUNTS TWO THROUGH NINE
### (Aggravated Identity Theft)

54.     Paragraphs 1 through 19, 21 through 49, and 57 through 64 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

55.     On or about the dates specified below, in the District of Columbia and elsewhere, Defendants VIKTOR BORISOVICH NETYKSHO, BORIS ALEKSEYEVICH ANTONOV, DMITRIY SERGEYEVICH BADIN, IVAN SERGEYEVICH YERMAKOV, ALEKSEY VIKTOROVICH LUKASHEV, SERGEY ALEKSANDROVICH MORGACHEV, NIKOLAY YURYEVICH KOZACHEK, PAVEL VYACHESLAVOVICH YERSHOV, ARTEM ANDREYEVICH MALYSHEV, ALEKSANDR VLADIMIROVICH OSADCHUK, and ALEKSEY ALEKSANDROVICH POTEMKIN did knowingly transfer, possess, and use, without lawful authority, a means of identification of another person during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), namely, computer fraud in violation of Title 18, United States Code, Sections 1030(a)(2)(C) and 1030(c)(2)(B), knowing that the means of identification belonged to another real person:

| Count | Approximate Date | Victim | Means of Identification |
|---|---|---|---|
| 2 | March 21, 2016 | Victim 3 | Username and password for personal email account |
| 3 | March 25, 2016 | Victim 1 | Username and password for personal email account |
| 4 | April 12, 2016 | Victim 4 | Username and password for DCCC computer network |
| 5 | April 15, 2016 | Victim 5 | Username and password for DCCC computer network |
| 6 | April 18, 2016 | Victim 6 | Username and password for DCCC computer network |
| 7 | May 10, 2016 | Victim 7 | Username and password for DNC computer network |
| 8 | June 2, 2016 | Victim 2 | Username and password for personal email account |
| 9 | July 6, 2016 | Victim 8 | Username and password for personal email account |

All in violation of Title 18, United States Code, Sections 1028A(a)(1) and 2.

## COUNT TEN
### (Conspiracy to Launder Money)

56.     Paragraphs 1 through 19, 21 through 49, and 55 are re-alleged and incorporated by reference as if fully set forth herein.

57.     To facilitate the purchase of infrastructure used in their hacking activity—including hacking into the computers of U.S. persons and entities involved in the 2016 U.S. presidential election and releasing the stolen documents—the Defendants conspired to launder the equivalent of more than $95,000 through a web of transactions structured to capitalize on the perceived anonymity of cryptocurrencies such as bitcoin.

58.     Although the Conspirators caused transactions to be conducted in a variety of currencies, including U.S. dollars, they principally used bitcoin when purchasing servers, registering domains, and otherwise making payments in furtherance of hacking activity.  Many of these payments were

processed by companies located in the United States that provided payment processing services to hosting companies, domain registrars, and other vendors both international and domestic.  The use of bitcoin allowed the Conspirators to avoid direct relationships with traditional financial institutions, allowing them to evade greater scrutiny of their identities and sources of funds.

59.     All bitcoin transactions are added to a public ledger called the Blockchain, but the Blockchain identifies the parties to each transaction only by alpha-numeric identifiers known as bitcoin addresses.  To further avoid creating a centralized paper trail of all of their purchases, the Conspirators purchased infrastructure using hundreds of different email accounts, in some cases using a new account for each purchase.  The Conspirators used fictitious names and addresses in order to obscure their identities and their links to Russia and the Russian government.  For example, the dcleaks.com domain was registered and paid for using the fictitious name "Carrie Feehan" and an address in New York.  In some cases, as part of the payment process, the Conspirators provided vendors with nonsensical addresses such as "usa Denver AZ," "gfhgh ghfhgfh fdgfdg WA," and "1 2 dwd District of Columbia."

60.     The Conspirators used several dedicated email accounts to track basic bitcoin transaction information and to facilitate bitcoin payments to vendors.  One of these dedicated accounts, registered with the username "gfadel47," received hundreds of bitcoin payment requests from approximately 100 different email accounts.  For example, on or about February 1, 2016, the gfadel47 account received the instruction to "[p]lease send *exactly* **0.026043** bitcoin to" a certain thirty-four character bitcoin address.  Shortly thereafter, a transaction matching those exact instructions was added to the Blockchain.

61.     On occasion, the Conspirators facilitated bitcoin payments using the same computers that they used to conduct their hacking activity, including to create and send test spearphishing emails.

Additionally, one of these dedicated accounts was used by the Conspirators in or around 2015 to renew the registration of a domain (linuxkrnl.net) encoded in certain X-Agent malware installed on the DNC network.

62.     The Conspirators funded the purchase of computer infrastructure for their hacking activity in part by "mining" bitcoin.  Individuals and entities can mine bitcoin by allowing their computing power to be used to verify and record payments on the bitcoin public ledger, a service for which they are rewarded with freshly-minted bitcoin.  The pool of bitcoin generated from the GRU's mining activity was used, for example, to pay a Romanian company to register the domain dcleaks.com through a payment processing company located in the United States.

63.     In addition to mining bitcoin, the Conspirators acquired bitcoin through a variety of means designed to obscure the origin of the funds.  This included purchasing bitcoin through peer-to-peer exchanges, moving funds through other digital currencies, and using pre-paid cards.  They also enlisted the assistance of one or more third-party exchangers who facilitated layered transactions through digital currency exchange platforms providing heightened anonymity.

64.     The Conspirators used the same funding structure—and in some cases, the very same pool of funds—to purchase key accounts, servers, and domains used in their election-related hacking activity.

      a.     The bitcoin mining operation that funded the registration payment for dcleaks.com also sent newly-minted bitcoin to a bitcoin address controlled by "Daniel Farell," the persona that was used to renew the domain linuxkrnl.net.  The bitcoin mining operation also funded, through the same bitcoin address, the purchase of servers and domains used in the GRU's spearphishing operations, including accounts-qooqle.com and account-gooogle.com.

    b.       On or about March 14, 2016, using funds in a bitcoin address, the Conspirators purchased a VPN account, which they later used to log into the @Guccifer_2 Twitter account.  The remaining funds from that bitcoin address were then used on or about April 28, 2016, to lease a Malaysian server that hosted the dcleaks.com website.

    c.       The Conspirators used a different set of fictitious names (including "Ward DeClaur" and "Mike Long") to send bitcoin to a U.S. company in order to lease a server used to administer X-Tunnel malware implanted on the DCCC and DNC networks, and to lease two servers used to hack the DNC's cloud network.

### Statutory Allegations

65.   From at least in or around 2015 through 2016, within the District of Columbia and elsewhere, Defendants VIKTOR BORISOVICH NETYKSHO, BORIS ALEKSEYEVICH ANTONOV, DMITRIY SERGEYEVICH BADIN, IVAN SERGEYEVICH YERMAKOV, ALEKSEY VIKTOROVICH LUKASHEV, SERGEY ALEKSANDROVICH MORGACHEV, NIKOLAY YURYEVICH KOZACHEK, PAVEL VYACHESLAVOVICH YERSHOV, ARTEM ANDREYEVICH MALYSHEV, ALEKSANDR VLADIMIROVICH OSADCHUK, and ALEKSEY ALEKSANDROVICH POTEMKIN, together with others, known and unknown to the Grand Jury, did knowingly and intentionally conspire to transport, transmit, and transfer monetary instruments and funds to a place in the United States from and through a place outside the United States and from a place in the United States to and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, namely, a violation of Title 18, United States Code, Section 1030, contrary to Title 18, United States Code, Section 1956(a)(2)(A).

    All in violation of Title 18, United States Code, Section 1956(h).

## COUNT ELEVEN
### (Conspiracy to Commit an Offense Against the United States)

66.     Paragraphs 1 through 8 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

### Defendants

67.     Paragraph 18 of this Indictment relating to ALEKSANDR VLADIMIROVICH OSADCHUK is re-alleged and incorporated by reference as if fully set forth herein.

68.     Defendant ANATOLIY SERGEYEVICH KOVALEV (Ковалев Анатолий Сергеевич) was an officer in the Russian military assigned to Unit 74455 who worked in the GRU's 22 Kirova Street building (the Tower).

69.     Defendants OSADCHUK and KOVALEV were GRU officers who knowingly and intentionally conspired with each other and with persons, known and unknown to the Grand Jury, to hack into the computers of U.S. persons and entities responsible for the administration of 2016 U.S. elections, such as state boards of elections, secretaries of state, and U.S. companies that supplied software and other technology related to the administration of U.S. elections.

### Object of the Conspiracy

70.     The object of the conspiracy was to hack into protected computers of persons and entities charged with the administration of the 2016 U.S. elections in order to access those computers and steal voter data and other information stored on those computers.

### Manner and Means of the Conspiracy

71.     In or around June 2016, KOVALEV and his co-conspirators researched domains used by U.S. state boards of elections, secretaries of state, and other election-related entities for website vulnerabilities.  KOVALEV and his co-conspirators also searched for state political party email addresses, including filtered queries for email addresses listed on state Republican Party websites.

72.     In or around July 2016, KOVALEV and his co-conspirators hacked the website of a state board of elections ("SBOE 1") and stole information related to approximately 500,000 voters, including names, addresses, partial social security numbers, dates of birth, and driver's license numbers.

73.     In or around August 2016, KOVALEV and his co-conspirators hacked into the computers of a U.S. vendor ("Vendor 1") that supplied software used to verify voter registration information for the 2016 U.S. elections.   KOVALEV and his co-conspirators used some of the same infrastructure to hack into Vendor 1 that they had used to hack into SBOE 1.

74.     In or around August 2016, the Federal Bureau of Investigation issued an alert about the hacking of SBOE 1 and identified some of the infrastructure that was used to conduct the hacking. In response, KOVALEV deleted his search history.   KOVALEV and his co-conspirators also deleted records from accounts used in their operations targeting state boards of elections and similar election-related entities.

75.     In or around October 2016, KOVALEV and his co-conspirators further targeted state and county offices responsible for administering the 2016 U.S. elections.   For example, on or about October 28, 2016, KOVALEV and his co-conspirators visited the websites of certain counties in Georgia, Iowa, and Florida to identify vulnerabilities.

76.     In or around November 2016 and prior to the 2016 U.S. presidential election, KOVALEV and his co-conspirators used an email account designed to look like a Vendor 1 email address to send over 100 spearphishing emails to organizations and personnel involved in administering elections in numerous Florida counties.   The spearphishing emails contained malware that the Conspirators embedded into Word documents bearing Vendor 1's logo.

**Statutory Allegations**

77.     Between in or around June 2016 and November 2016, in the District of Columbia and

elsewhere, Defendants OSADCHUK and KOVALEV, together with others known and unknown to the Grand Jury, knowingly and intentionally conspired to commit offenses against the United States, namely:

   a.   To knowingly access a computer without authorization and exceed authorized access to a computer, and to obtain thereby information from a protected computer, where the value of the information obtained exceeded $5,000, in violation of Title 18, United States Code, Sections 1030(a)(2)(C) and 1030(c)(2)(B); and

   b.   To knowingly cause the transmission of a program, information, code, and command, and as a result of such conduct, to intentionally cause damage without authorization to a protected computer, and where the offense did cause and, if completed, would have caused, loss aggregating $5,000 in value to at least one person during a one-year period from a related course of conduct affecting a protected computer, and damage affecting at least ten protected computers during a one-year period, in violation of Title 18, United States Code, Sections 1030(a)(5)(A) and 1030(c)(4)(B).

78.   In furtherance of the Conspiracy and to effect its illegal objects, OSADCHUK, KOVALEV, and their co-conspirators committed the overt acts set forth in paragraphs 67 through 69 and 71 through 76, which are re-alleged and incorporated by reference as if fully set forth herein.

   All in violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATION

79.   Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given to Defendants that the United States will seek forfeiture as part of any sentence in the event of Defendants' convictions under Counts One, Ten, and Eleven of this Indictment.  Pursuant to Title 18, United

States Code, Sections 982(a)(2) and 1030(i), upon conviction of the offenses charged in Counts

One and Eleven, Defendants NETYKSHO, ANTONOV, BADIN, YERMAKOV, LUKASHEV,

MORGACHEV, KOZACHEK, YERSHOV, MALYSHEV, OSADCHUK, POTEMKIN, and

KOVALEV shall forfeit to the United States any property, real or personal, which constitutes or

is derived from proceeds obtained directly or indirectly as a result of such violation, and any

personal property that was used or intended to be used to commit or to facilitate the commission

of such offense.  Pursuant to Title 18, United States Code, Section 982(a)(1), upon conviction of

the offense charged in Count Ten, Defendants NETYKSHO, ANTONOV, BADIN,

YERMAKOV, LUKASHEV, MORGACHEV, KOZACHEK, YERSHOV, MALYSHEV,

OSADCHUK, and POTEMKIN shall forfeit to the United States any property, real or personal,

involved in such offense, and any property traceable to such property.  Notice is further given that,

upon conviction, the United States intends to seek a judgment against each Defendant for a sum

of money representing the property described in this paragraph, as applicable to each Defendant

(to be offset by the forfeiture of any specific property).

### Substitute Assets

80.     If any of the property described above as being subject to forfeiture, as a result of any act or

omission of any Defendant --

     a.     cannot be located upon the exercise of due diligence;

     b.     has been transferred or sold to, or deposited with, a third party;

     c.     has been placed beyond the jurisdiction of the court;

     d.     has been substantially diminished in value; or

     e.     has been commingled with other property that cannot be subdivided without

            difficulty;

it is the intent of the United States of America, pursuant to Title 18, United States Code, Section

982(b) and Title 28, United States Code, Section 2461(c), incorporating Title 21, United States

Code, Section 853, to seek forfeiture of any other property of said Defendant.

Pursuant to 18 U.S.C. §§ 982 and 1030(i); 28 U.S.C. § 2461(c).


Robert S. Mueller, III
Special Counsel
U.S. Department of Justice

A TRUE BILL:


_____
Foreperson

Date: July 13, 2018